# ORIGINAL

**WARNING:** **THIS IS A SEALED DOCUMENT CONTAINING NON-PUBLIC INFORMATION**

FLORENCE T. NAKAKUNI #2286
United States Attorney
District of Hawaii

**SEALED**
**BY ORDER OF THE COURT**

DARREN W. K. CHING #6903
Assistant United States Attorney
PJKK Federal Building, Room 6-100
300 Ala Moana Boulevard
Honolulu, Hawaii  96850
Telephone:  (808) 541-2850
Facsimile:  (808) 541-2958
E-mail:  Darren.Ching@usdoj.gov

**FILED IN THE**
**UNITED STATES DISTRICT COURT**
**DISTRICT OF HAWAII**

**JAN 1 1 2017**

at ___ o'clock and ___ min. ___ M
**SUE BEITIA, CLERK**

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT
### DISTRICT OF HAWAII

IN RE APPLICATION OF THE )
UNITED STATES OF AMERICA FOR )
AN ORDER PURSUANT TO )
18 U.S.C. § 2703(d) )
)
IN RE (808) 465-6074 )
_____ )

MC17 '00007 DKW   KJM

MISC. NO.

**Filed Under Seal**

### APPLICATION OF THE UNITED STATES
#### FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d)

The United States of America, moving by and through its undersigned counsel,

respectfully submits under seal this *ex parte* application for an Order pursuant to 18 U.S.C.

§ 2703(d).  The proposed Order would require **T-Mobile**, a cellular service provider, located in

**Parsippany, New Jersey**, to disclose certain records and other information pertaining to the

cellular telephone assigned call number **(808) 465-6074**, as described in Part I of Attachment A

to the proposed Order.  The records and other information to be disclosed are described in Part II

of Attachment A.  In support of this application, the United States asserts:

LEGAL BACKGROUND

1.      **T-Mobile** is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).  Accordingly, the United States may use a court order issued under § 2703(d) to require **T-Mobile** to disclose the items described in Part II of Attachment A, as these records pertain to a subscriber of electronic communications service and are not the contents of communications.  *See* 18 U.S.C. § 2703(c)(1).

2.      This Court has jurisdiction to issue the proposed Order because it is "a court of competent jurisdiction," as defined in 18 U.S.C. § 2711(3).  *See* 18 U.S.C. § 2703(d). Specifically, the Court in Hawaii is a district court of the United States that has jurisdiction over the offense being investigated.  *See* 18 U.S.C. § 2711(3)(A)(i).

3.      A court order under § 2703(d) "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation."  18 U.S.C. § 2703(d).  Accordingly, the next section of this application sets forth specific and articulable facts showing that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation.

THE RELEVANT FACTS

The following information has been provided by State and Federal law enforcement officers (investigators) investigating this case:

4.      The United States is investigating Michael Miske Jr. (Miske), date of birth 02/15/1974, Jacob Smith (Smith), date of birth 07/29/1993, Lance Bermudez (Bermudez), date

of birth 5/21/1991, Delia Miske (Delia), date of birth 08/02/1994, and other known and unknown individuals of, inter alia, 18 U.S.C. § 1958 – Use of Interstate Commerce Facilities in the Commission of Murder-Hire, and 21 U.S.C. § 841 (Possession With Intent to Distribute Controlled Substances).

5.     The investigation relates to Michael Miske, Jr. (Miske) hiring Smith and Bermudez to murder Johnathan Fraser (Frazer).  Based on information provided by the Federal Bureau of Investigation (FBI), the Honolulu Police Department (HPD), Cooperating Defendants (CDs), and Confidential Human Sources (CHSs), it appears that matters related to the above offenses have been, and may continue to be discussed with Delia who used **T-Mobile** cell phone number **(808) 465-6074**.  **T-Mobile** is an electronic communication service provider.

6.     On November 17, 2015, Caleb Miske (Caleb), son of Michael Miske, Jr., (Miske) was involved in a motor vehicle accident with Johnathan Fraser (Fraser) in Kaneohe, Hawaii. Investigation by HPD determined that Caleb and Fraser were together in the same vehicle while traveling at an excessive speed when it collided with another vehicle on Kaneohe Bay Drive. Investigation by HPD determined that Caleb was the driver of the vehicle and Fraser was in the front passenger seat.  As a result of the accident, Fraser and Caleb suffered from severe injuries and were hospitalized.  Fraser was able to recover physically to the point where he was released from the hospital, although he still suffered mental and physical pain and fatigue.  Caleb was unable to recover from the accident and died in the hospital on March 12, 2016.

7.     On July 30, 2016 at approximately 9:30 p.m., Fraser and the vehicle he used, a 1994 Honda Civic, were reported missing from his apartment, located at 6233 Keokea Place, Apartment #101, Honolulu, Hawaii.  Fraser and his vehicle were reported missing by Fraser's family and close friends.  Fraser was last seen at approximately 9:30 a.m. on July 30th.

Following the report of Fraser's disappearance, HPD opened a missing person investigation to locate Fraser and his vehicle. As of the date of this application, Fraser remains missing.

      A. The 1994 Honda Civic used by Fraser was purchased by Miske, and the registered owner was Hawaii Partners LLC, one of Miske's businesses.

8. On July 31, 2016, HPD interviewed Confidential Witness One (CW1) regarding Fraser's disappearance. CW1 is a close acquaintance to Fraser, Fraser's family, and Fraser's friends. CW1 stated the apartment Fraser had been staying in had been rented by Miske for his daughter-in-law, Delia Miske (Delia), the widow of Caleb. Investigators believe that Miske had permitted Fraser and Fraser's girlfriend, Ashley Wong (Wong), to stay at the apartment with Delia. CW1 stated that prior to his death, Caleb and Fraser were good friends. CW1 also stated that Delia and Wong were good friends.

9. CW1 stated that Miske and his family did not accept that Caleb was the driver during the accident with Fraser that ultimately caused his death. CW1 stated that Miske had openly expressed to family and friends his belief that Fraser was the driver during the accident and was at fault for the crash. CW1 stated that, based on personal use, (808) 476-9223 was the cellular phone number CW1 used when communicating with Miske. CW1 also stated that, based on personal use **(808) 465-6074** was the cellular phone number CW1 used when communicating with Delia. CW1 indicated that Miske proposed that Fraser distribute marijuana for him and that Delia then provided Fraser with a sample of the marijuana that Miske would supply to Fraser.

10. On July 31, 2016, HPD interviewed Confidential Witness Two (CW2) regarding Fraser's disappearance. CW2 is another close acquaintance of Fraser, Fraser's family, and

Fraser's friends.  CW2 advised that during hospital visits, Miske openly blamed Fraser for the vehicle accident that caused Caleb's death.  CW2 stated that Miske and his family forbid Fraser from attending Caleb's funeral services because of Miske's belief that Fraser was the reason for his son's death.  However, after Caleb's funeral, Miske personally visited the family of Fraser and expressed that he believed the hospital was to blame for Caleb's death.  Despite that representation by Miske, Miske's family threatened Fraser.

11.     Despite initially blaming Fraser for his son's death in March of 2016, months later, in July of 2016, Miske and Delia allowed Fraser and his girlfriend to stay in an apartment that was believed to have been rented by Miske for his daughter-in-law, Delia.  Based on investigation to date, investigators believe Miske and Delia invited Fraser to stay in the apartment not out of friendship or love for Fraser, but as a ruse to facilitate his abduction and murder in a way that would minimize the potential evidence to be collected after his disappearance.

12.     On August 7, 2016, the Honda Civic used by Fraser was discovered in the vicinity of 6233 Keokea Place, Apartment #101, near the intersection of Summer Street and Kuliouou Road in Honolulu, Hawaii.  The vehicle had been secured and was unattended.

13.     Confidential Source One (CS1) has provided reliable information to the FBI for approximately six (6) months.  Information provided by CS1 has been corroborated in the past by information from consensual recordings, surveillance, and the review of records, to include telephone records, criminal history records, Department of Motor Vehicle Records, and data from pen registers.  CS1's criminal history includes gambling promotion, DUI, driving without a license, and conspiracy to possess with intent to distribute methamphetamine.  CS1 has pleaded

guilty to the aforementioned drug charge and is providing information to investigators in exchange for prosecutorial consideration.

14.     Based upon investigation to date, investigators believe Preston Kimoto (Kimoto) is a close business associate of Miske and an employee of Miske's pest control business, Kamaaina Termite and Pest Control (KTPC), located in Honolulu, Hawaii.  On August 19, 2016, CS1 participated in a consensually recorded conversation with Kimoto.  A recording of this conversation was reviewed by investigators.  CS1 and Kimoto discussed Miske and the disappearance of Fraser.  Kimoto related that Miske did not care about the consequences of his actions following the death of his son Caleb, and Miske believed Fraser was the driver during Caleb's fatal accident.  CS1 and Kimoto also discussed that Miske told Kimoto law enforcement may come to question Kimoto but that Kimoto had nothing to worry about because Kimoto did not personally know Fraser.  However, Miske offered Kimoto the services of his attorney if approached by law enforcement.

15.     Confidential Source Two (CS2) has provided reliable information to HPD and FBI for approximately two (2) months.  Information provided by CS2 has been corroborated in the past by information from a review of records, to include telephone records, criminal history records, prison records, social media, Department of Motor Vehicle records, and data from Pen Registers.  CS2's criminal history includes unauthorized entry into a motor vehicle in the second degree, theft in the third degree, and multiple probation violations.  CS2 is providing information to investigators because of fear for his/her safety and the safety of the community.

16.     On November 30, 2016, CS2 provided information to investigators relating to Fraser's disappearance.  CS2 advised that he/she was an associate of both Jacob Smith (Smith) and Lance Bermudez (Bermudez).  Based on his/her association with Smith and Bermudez, CS2

reported that Miske was a major drug distributor, and Smith would tell CS2 when Miske "was happening." This referred to a time when Miske received a large shipment of drugs. Smith would contact Miske by phone when Smith needed to make money. Miske would call Smith on the phone in response. Miske would advise Smith to stop by Miske's business, KPTC or "M Nightclub." Smith would park his vehicle in the Sports Authority parking lot near Ward center. Smith would then walk to KTPC and receive orders from Miske. For instance, Miske would provide Smith with information about competing drug dealers that needed to be "clipped" or "hit." Smith would arrange a robbery or an assault against the drug dealer, and Miske would pay Smith in return. Miske advised Smith to "lay low" after completing these illegal tasks. Smith referred to Miske as "the big man," "the plug," or "the come up," alluding to the fact that Miske found work for Smith and paid Smith to conduct illegal business on Miske's behalf. CS2 advised that Smith's cellular telephone number was (808) 479-6281.

      A. Based on investigation from multiple sources, investigators know KPTC to be Miske's business and M Nightclub to be a business formerly owned by Miske.

      B. Investigators conducted a query in law enforcement databases of telephone number (808) 479-6281 and determined that the number was in contact with an inmate housed at Federal Detention Center Honolulu during August 2016. Investigators obtained records for the inmate in contact with this number, including the inmate's phone contact list and recordings of phone calls with (808) 479-6281. The inmate's contact list provided the name "Jake Smith" as the contact for (808) 479-6281.

      C. Investigators listened to two calls between the inmate and an individual believed to be Jacob Smith. During the call the individual acknowledged that he had been

hanging out with "Hammah," which investigators know to be an alias or street name for Lance Bermudez.  Other inmates in the background were asking who the inmate was talking to and he advised he was talking to "Jakey Boy," which investigators know is also an alias or street name for Jacob Smith.  The individual believed to be Smith advised during the call that he was driving a 1979 Monte Carlo.

17.   CS2 advised that Smith and Bermudez often drove stolen vehicles and rental cars. CS2 advised that Smith and Bermudez drove a black Monte Carlo, a black BMW sedan, and a white 2016 Chrysler 300c.  CS2 also advised that Smith had multiple girlfriends, including Lovelyn Duarte.

A.   On September 11, 2016, HPD officers observed Smith driving a white Chrysler 300c sedan, bearing Hawaii license plate SXD816.  On October 12, 2016, HPD officers observed Bermudez driving a white Chrysler 300c sedan, bearing Hawaii license plate SXD816.  HPD recovered the Chrysler 300c on October 17, 2016, from Enterprise Rent-A-Car in Honolulu, Hawaii.  Records from Enterprise Rent-A-Car indicated the vehicle was rented by Ashlin Scanlan.  Inside the vehicle officers recovered a store receipt for items purchased by Lovelyn Duarte.

B.   On April 19, 2016, HPD recovered a stolen 2015 BMW sedan in Honolulu, Hawaii.  Among other items, HPD officers recovered black zip ties, a roll of duct tape, a copy of a eulogy for Caleb Miske, 7.62 caliber ammunition, ski masks, end caps for metal pipes, stolen HPD pepper spray, body armor, and handcuffs.  An HPD forensics team removed latent finger prints from the vehicle and matched them to latent fingerprints on file for Lance Bermudez.

18.     CS2 advised that Smith and Bermudez lived at a house in Kalihi Valley and described the layout of the single family home.  HPD officers obtained a copy of the rental agreement for 3255 Kalihi Street, Unit A, Honolulu, Hawaii, from the property owner.  The rental agreement was for a period beginning May 1, 2016, and ending October 31, 2016.  Jacob L. Smith, Lovelyn Duarte, and two other individuals were listed as tenants on the lease.  Jacob L. Smith listed a phone number of (808) 479-6281.  The residence was vacated in November 2016, and HPD officers entered the residence with the consent of the owner.  The layout of the home was very similar to the description provided by CS2.

A.  As corroboration, on December 6, 2016, CS2 rode in a vehicle with HPD and provided relative directions to the residence located at 3255 Kalihi Street, Unit A, Honolulu, Hawaii.  Upon arrival at the residence, CS2 positively identified the residence as the place where Smith and Bermudez lived.

19.     CS2 advised that he/she had visited the residence at 3255 Kalihi Street, Unit A, Honolulu, Hawaii, and noticed another male individual in the outside bathroom underneath the stairs as he/she approached the house.  The individual had long hair and a scar on his face.  CS2 recognized the individual as Fraser based on pictures he had seen later on a Crimestoppers alert notification of Fraser's disappearance.  Fraser was tied to a green, plastic garden chair with zip-tie restraints and duct tape.  Duct tape also covered Fraser's mouth.  Fraser had a bloodied face, and Smith repeatedly kicked Fraser about the head.  Smith and Bermudez used a MAPP gas torch to burn Fraser.  Smith and Bermudez started burning Fraser's feet and hands.  Smith and Bermudez eventually worked their way up Fraser's body with the torch.  The torch included a yellow bottle of gas.  CS2 observed a tripod set up with a phone was mounted to it, which

recorded the torture as it occurred.  CS2 was extremely disturbed by what he/she saw and left the house.

    A.  When questioned as to the actual date CS2 made these observations, CS2 could not recall (now months later) the exact date when these incidents occurred.

    B.  When trying to reconstruct the dates, although he/she vividly recalled the events, CS2 believed that the incidents he/she described occurred in the latter part of July or early August 2016.

    20.  CS2 stated that he/she returned to the Kalihi residence a few days later. Bermudez and Smith were present at the residence.  Smith explained that Miske wanted Fraser tortured as a punishment for Caleb's death.  Smith showed CS2 a video on Smith's phone, which was the video of Fraser being tortured.  CS2 recognized the scene from the night he/she witnessed the torture.  CS2 recognized the boxing equipment in the background of the video as belonging to the Kalihi residence.  Bermudez also had the video on his phone, which he attempted to show CS2.  CS2 refused to watch the full duration of the videos.  Bermudez was also in the kitchen tending to a very large pot cooking on the stove.  CS2 approached the stove and observed a very large bone sticking out of the pot.  There was no smell emitting from the pot.  However, the water was a shade of orange-red that CS2 had never seen while cooking. Flesh began to fall away from the bone, and CS2 believed the bone to be human.  CS2 immediately thought about Fraser's torture and presumed the body part was from Fraser's body and that Fraser was dead.

    21.  CS2 advised that he/she was present on two occasions in August 2016 when Smith received cash payments from Miske.  On the first occasion, CS2 drove Smith to KTPC,

and Smith went inside the business and returned with a large amount of cash consisting of $100 and $50 bills bound by rubber bands.  On the second occasion, CS2 drove Smith to M Nightclub and parked on the street near the courthouse side of Restaurant Row while Smith went inside the club.  Smith returned with cash and advised it was from Miske.

    A. Investigators observed a Facebook posting published on August 18, 2016, depicting Smith inside a vehicle holding a large bundle of U.S. currency.  A $100 bill is visible on one end of the bundle.

22. On July 21, 2016, in Misc. No. 16-00209 DKW-KSC, U.S. Magistrate Barry M. Kurren authorized a court ordered pen register trap and trace for telephone number (808) 476-9223, a cellular telephone known to be used by Miske.  A review of telephone toll records for (808) 476-9223 indicate the number had approximately sixty-four (64) text message contacts and two voice calls with (808) 479-6281 (phone known to be used by Smith) from July 29, 2016, to July 31, 2016.  The number of text messages and calls for that period significantly exceeded the number of text messages and voice calls between the same phones during other periods.

    A. Based on investigators' training and experience, and the investigation to date, investigators believe these telephone contacts between Miske and Smith were communications to plan, organize, and carry out the murder of Fraser on or about July 30, 2016.

    B. Based on investigators' training and experience, and the investigation to date, investigators are informed that the use of a cellular telephone is legally construed as the use of a facility in interstate commerce.

C.  Investigators received subscriber information from Sprint for cellular telephone number (808) 479-6281.  The provided subscriber effective November 13, 2015, was Jacob Smith, 45-746 Wainana Street, Kaneohe, Hawaii 96744.   Jacob Smith was the subscriber for the cellular phone number until approximately September 10, 2016.  The provided subscriber effective September 10, 2016, was Kaika Martin, 45-746 Wainana Street, Kaneohe, Hawaii 96744.  The provided subscriber effective November 18, 2016, was Kirra Duarte, 45-746 Wainana Street, Kaneohe, Hawaii 96744.  A private database check of address 45-746 Wainana Street, Kaneohe, Hawaii 96744, revealed that the address is provided as a residential address for Jacob L. Smith.

23.     Based on a review of records and database checks investigators know AT&T Wireless, a telecommunications company based in North Palm Beach, Florida, to be the service provider for (808) 476-9223.  Based on a review of records and database checks investigators know Sprint, a telecommunications company based in Overland Park, Kansas, to be the service provider for (808) 479-6281.  Investigators believes voice call and text messages between Miske and Smith were made within the state of Hawaii.  However, based on investigators' knowledge, training and experience, and conversations with other technical experts within the Federal Bureau of Investigation, investigators knows that that voice calls and text messages made in Hawaii must emit signals and send data through a series of transmitters, receivers, and switches located in other states within the interstate telecommunications network of service providers like AT&T and Sprint.

24.     On November 20, 2016, HPD conducted a forensic search of Smith and Bermudez's former residence located at 3255 Kalihi Street, Honolulu, Hawaii.  The residence

was uninhabited and had been cleaned after Smith and Bermudez moved out on November 1, 2016. Using luminol spray, HPD forensic technicians were able to observe what was believed to be blood inside of the bathroom of the residence that was not visible to the naked eye. Forensic technicians collected samples of the biological material as well as hair from the bathtub drain and subsequently sent the samples to HPD laboratories for further forensic testing and comparison to known DNA samples for Fraser.

    A.  The results of the hair analysis are still pending.

    B.  Analysis of the biological material revealed that there was no blood detected in the samples that were collected.

    C.  With regard to the DNA analysis, there is currently no DNA profile of Fraser that is suitable for comparison. In addition, of the samples of biological materials collected, some of those samples lacked interpretable DNA, had low levels of DNA for comparison purposes, or the DNA sample obtained was consistent with a mixture of two or more individuals.

25.    On December 6, 2016, HPD arranged a polygraph examination of CS2 regarding the statements he/she provided to investigators involving the torture of Fraser at the Kalihi residence. Investigators believed CS2 was under the influence of drugs on December 7, 2016, and postponed conducting the polygraph for 24 hours.

26.    On December 7, 2016, CS2 arrived voluntarily at HPD Main Station to conduct the polygraph examination. An examination was attempted, but CS2 declined to participate in the polygraph examination prior to administering the test.

27.     On December 7, 2016, investigators attempted to interview CS2 at HPD Main Station following his/her declination to take the polygraph exam and to determine why CS2 declined.  CS2 appeared to investigators' to be in an extremely emotional state.  CS2 advised that he/she did not know what questions were going to be asked during the exam and felt he/she did not have time to prepare.  CS2 stated that Miske had hired Smith and Bermudez to kill Fraser and that Smith told CS2 Fraser was never going to come home.  CS2 advised that everything else he/she told investigators was a lie.  CS2 began to cry and exhibited extremely emotional reactions.  CS2 attempted to hide in the corner of the interview room and then crawled into the fetal position under the desk in the interview room.  CS2 eventually composed himself/herself and asked investigators to arrest him/her already or to let him/her go.  CS2 was advised by investigators that he/she was not under arrest and was free to leave.  CS2 advised that he/she wanted to go get some rest and then talk again later.  CS2 subsequently departed the station.

28.     On December 22, 2016, investigators interviewed CS2 at HPD Main Station. CS2 advised that he/she had lied previously regarding his/her observation of an arm bone being boiled by Bermudez in a pot and that he/she made that statement to relatives to see if they could be trusted.  CS2 advised that the statements made regarding his/her observations of Fraser being beaten and burned by a torch at the Kalihi house were true.  CS2 advised that he/she had observed a portion of the video of the torture and that he/she believed the video may be saved on Smith's Gmail e-mail account.  CS2 advised that Smith maintained a record of his criminal activity on his Gmail account and would sometimes send pictures of his crimes to people he trusted.  CS2 did not know Smith's Gmail account address.

29.     On December 7, 2016, investigators interviewed Confidential Witness Three (CW3).  CW3 is a relative of CS2 and CS2's family and has a close relationship with CS2's

friends. CW3 stated that CS2 had confessed his/her involvement with the abduction of Fraser to CW3 in August 2016. CW3 advised that CS2 had arrived at CW3's residence in August 2016 in a black Monte Carlo vehicle that CS2 advised belonged to Smith. CS2 only had the vehicle for approximately three days and then returned the vehicle to Smith. Shortly thereafter, CS2 attempted to commit suicide. CW3 confronted CS2 regarding CS2's actions, and CS2 advised CW3 that he/she had visited a residence with Smith and Bermudez and abducted a male CS2 later identified as Fraser. CS2 further stated to CW3 that CS2, Smith, and Bermudez transported Fraser to a house in Kalihi. CS2 advised CW3 that CS2 was present with Smith when Smith met with the father of a boy who had been in an accident with Fraser. CW3 referred to the father as "Mystic," a male who had a bar that was shutting down (investigators believe CW3 was referring to Miske, his son Caleb and M Nightclub, one of Miske's former businesses). CS2 related to CW3 that the father agreed to pay Smith $50,000 to kill Fraser, make him suffer, and record the murder on video. CS2 also relayed to CW3 that a phone was on a tripod recording the torture at the house, that Fraser was bound with duct tape, and that Smith and Bermudez began to beat Fraser and burn him with a torch that had a green or yellow gas can. CS2 related to CW3 that CS2 could not stand to watch and that Smith told CS2 to take Smith's car and leave, which CS2 did.

    A. CW3 related that CS2 had returned Smith's car a few days later, and CS2 observed Bermudez tending to a large pot with a ladle. CS2 observed what appeared to be a human forearm and a large bone in the pot. Bermudez relayed to CS2 that it took three to four days to complete the job. CS2 advised CW3 that a copy of the torture video was provided to the father of the boy who was killed in the accident with Fraser.

B. CW3 related that CS2 had confessed to CW3 that he used controlled substances and committed other crimes with Bermudez and Smith, including robbery.

C. A short time after CS2 related these events to CW3, CW3 saw a news report detailing Fraser's disappearance. CW3 showed CS2 a photo of Fraser from the news report, and CS2 began to sob and identified Fraser as the young man who was taken to the Kalihi residence and tortured.

30.    On December 7, 2016, Confidential Witness Four (CW4) was interviewed by HPD. CW4 advised that he/she is close with and has known Jacob Smith for over four years. CW4 initiated contact with HPD to file a report as a victim of a physical assault by Jacob Smith. CW4 also turned over to HPD a cellular telephone. CW4 advised that Jacob Smith is known to have used a total of four (4) different phones within the last year. CW4 stated that since September 2016, Jacob Smith would only use his phones for a short period and would then drop the use of that phone to obtain a new phone in order to avoid law enforcement investigative efforts and to thwart any law enforcement attempts to detect or locate him by the use of his phone.

A. CW4 advised that Jacob Smith utilized cellular phone number (808) 479-6281 during July and August 2016. CW4 stated that the phone was broken but that Jacob Smith still possesses that phone.

B. CW4 advised that Jacob Smith then utilized cellular phone number (808) 726-1019 during approximately September through November 2016. CW4 described this cellular phone as white in color and believes that it may be located in a 1998 Black Lexus utilized by Smith.

C.  CW4 advised that Jacob Smith then utilized the phone number (808) 364-6434 for an approximate period of a few weeks.

D.  CW4 advised that Jacob Smith has recently contacted CW4 with another cellular phone utilizing the same phone number (808) 364-6434 that was previously used by the Smith.

E.  CW4 advised that Jacob Smith utilized the following Gmail e-mail addresses: lovenjake4ever@gmail.com and jakesmithkaneohekicks@gmail.com.

31.     CW4 stated that she/he is fearful of Jacob Smith because of his violent nature and because she/he is also fearful of the people that Smith associates with.  CW4 stated that Jacob Smith does "jobs" for Miske meaning that Miske pays Smith to physically assault people for Miske's purposes and ultimate benefit related to Miske's business enterprises.  CW4 stated that Smith started doing "jobs" for Miske from the beginning of the year 2016.  CW4 knows of two occasions when Miske paid Smith $2,000 and then again, paid Smith $2,500 for assaulting people that Miske identified.  CW4 advised that Smith related to CW4 on one of those occasions, that Smith was going to "M" (one of Miske's businesses) to do a "job."  CW4 stated that Smith explained to CW4 that Miske would identify the people and then Smith would stalk the person and then commit the assault.  CW4 also recalled a time when Smith was paid a partial payment of $14,000 in mid-July for a job he had done for Miske, which Smith was also sharing with two other individuals.  CW4 knew that one of the individuals was "Hammah," also known by CW4 as "Lance" (which, based on the investigation to date, investigators believe to be Lance Bermudez).  CW4 believes that Smith continues to be associated with Miske and that Smith relies upon Miske as a means of employment and income.  CW4 verbally positively identified a photograph of Miske but refused to sign the photo because CW4 was fearful of Miske.

32.     CW4 knew about Fraser's disappearance and had heard that Miske was involved. CW4 suspected that Jacob Smith was also involved and questioned Smith who responded for she/he to shutup, and "that they will never find him."

33.     CW4 stated that Jacob Smith was also involved in illegal narcotics and was told by friends and associates that Smith had a reputation for acquiring drugs from dealers by force or getting "fronted" drugs and not paying for it. CW4 personally observed illegal narcotics in Jacob Smith's possession and that he stored it in his vehicle. CW4 also observed Smith, at the 3255 Kalihi Street residence, in the possession of what CW4 suspected was crystal methamphetamine stored in a one (1) gallon zip-lock bag that was approximately half-filled. CW4 voiced objections to Smith to the presence of illegal drugs because of the danger and harm of CW4's young children having potential access or contact with Smith's illegal narcotics.

34.     CW4 also stated that CW4 has seen Jacob Smith in the possession of firearms and that the firearms were kept by Smith in his residence and in his vehicles.

35.     CW4 informed law enforcement officers that Jacob Smith drove and utilized a 1998 Black 4 door Lexus, Hawaii License Plate NND 656, VIN# JT8BH68X1W0005639 (hereinafter "Subject Vehicle"). CW4 stated that although the Subject Vehicle is registered in another person's name, the vehicle was driven by Jacob Smith since October 2016. CW4 is aware that the Subject Vehicle is currently in the custody of HPD. CW4 is aware and believes based on her personal information that the Subject Vehicle contains: 1) evidence of Jacob Smith's illegal narcotic activities as earlier described; 2) a firearm that Jacob Smith keeps stored in the vehicle for his possession and use, despite being a convicted felon; and 3) personal items belonging to Jacob Smith to include the cellular phone with number (808) 726-1019 which Jacob Smith used during approximately September through November 2016.

36.     On December 20, 2016, a Search Warrant was reviewed, approved and signed by the Honorable Magistrate Judge Richard L. Puglisi, in Mag No. 16-1586, which authorized the search of a 1998 Black 4 door Lexus sedan, Hawaii license plate NND 656, VIN number: JT8BH68X1W0005639, the vehicle known to be utilized and driven by Jacob Smith.  During the execution of that search warrant found and seized from the interior of the 1998 Lexus Sedan, among other items, was a cellular telephone, which is believed to be and known to be used by Jacob Smith as described by CW4, cellular telephone number 808-726-1019 used by Jacob Smith during the time period of approximately September through November 2016.

37.     On December 22, 2016, a Search Warrant was reviewed, approved and signed by the Honorable Magistrate Judge Richard L. Puglisi, in Mag No. 16-1593, which authorized the search of a Samsung Galaxy Amp cell phone IMEI: 356519073312547, the cellular telephone recovered from Smith's Lexus sedan.  The cell phone was examined and found to be assigned cellular telephone number (808) 726-1019.  Based upon a review of the data contained on the cell phone including text message and photo content, investigators believe the phone to have been utilized by Jacob Smith.

38.     A review of Samsung Galaxy Amp cell phone IMEI: 356519073312547 revealed that Gmail account whyyougottasayitlikejake@gmail.com was linked as a user account to the cell phone.

39.     A further review of Samsung Galaxy Amp cell phone IMEI: 356519073312547 revealed a contact listed as "Ham" as an assigned phone number for (808) 202-8799.  Based on investigation to date, investigators believe "Ham" is short for "Hammah", Lance Berumdez' alias, and that (808) 202-8799 is a cellular telephone number utilized by Bermudez.  A review of Smith's Samsung Galaxy Amp cellular telephone revealed approximately 176 text message

contacts between Smith and "Ham".  Investigators reviewed the content of these text messages and observed coded discussions of criminal activity including activity involving robberies, assaults and drug trafficking.

40.     Investigators reviewed toll records for Jacob Smith's cellular telephone 808-479-6281 during July 29, 2016 to July 30, 2016.  During this time period, Smith's number had approximately six (6) call and seventeen (17) text message contacts with (808) 202-8799, the phone number believed to be utilized by Lance Bermudez.

41.     Based on all of the facts and circumstances described in this application, along with investigators' training, experience, and consultations with others, there is probable cause to believe that an offense has been committed in violation of Title 18 United States Code, Section 1958 – Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire.  Based on investigators' training and experience and the facts as set forth in this application, there is also probable cause to believe that Michael Miske Jr., Jacob Smith, Lance Bermudez and others known and unknown, participated in a violation of 18 U.S.C. § 1951 (Interference of Commerce by Threats or Violence), 21 U.S.C. § 841 (Possession With Intent to Distribute Controlled Substances)  and 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm) and it appears that matters related to the above offenses have been, and may continue to be discussed using **T-Mobile** cell phone number **(808)  465-6074**.

REQUEST FOR ORDER

42.     The facts set forth in the previous section show that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation.  Specifically, these items will help the United States to identify and locate the individual(s) who are responsible for the events described

above, and to determine the nature and scope of their activities. Accordingly, the United States requests that **T-Mobile** be directed to produce all items described in Part II of Attachment A to the proposed Order.

43.      The United States further requests that the Order require **T-Mobile** not to notify any person, including the subscribers or customers of the account(s) listed in Part I of Attachment A, of the existence of the Order until further order of the Court.  *See* 18 U.S.C. § 2705(b). This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order."  *Id.* In this case, such an order would be appropriate because notification of the existence of the order will result in one or more of the adverse circumstances listed in 18 U.S.C. § 2705(b), such as seriously jeopardizing the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, or notify confederates.

\\

\\

\\

\\

\\

\\

\\

\\

44.      The United States further requests that the Court order that this application and any resulting order be sealed until further order of the Court.  As explained above, these documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on January 11, 2017.

Respectfully submitted,

FLORENCE T. NAKAKUNI
United States Attorney
District of Hawaii

By
Darren W.K. Ching
Assistant U.S. Attorney